# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETS

| | |
|---|---|
| DREW WEAVER, Individually And On Behalf Of All Others Similarly Situated, | C.A. No. |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| vs. | |
| NOVELOS THERAPEUTICS, INC., and HARRY S. PALMIN, | **JURY DEMANDED** |
| Defendants. | |

Plaintiff alleges the following based upon the investigation by Plaintiff's counsel, which included, among other things: a review of the Defendants' public documents, media interviews and reports, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Novelos Therapeutics, Inc. ("Novelos" or the "Company"), securities analysts' reports and advisories about the Company, and information readily available on the Internet.  Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION AND OVERVIEW

1.      This is a federal class action on behalf of purchasers (the "Class") of the common stock of Novelos, who purchased or otherwise acquired the Company's common stock between December 14, 2009 and February 24, 2010, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.      Novelos is a biopharmaceutical company commercializing oxidized glutathione-based compounds for the treatment of cancer and hepatitis.  The Company's most advanced drug development candidate is NOV-002.  NOV-002 is a small molecule compound based on a

proprietary formulation of oxidized glutathione that acts together with chemotherapy as a chemopotentiator and a chemoprotectant by regulating redox-sensitive cell signaling pathways. At the start of the Class Period, NOV-002 was in Phase 3 development for treatment of lung cancer under a Food and Drug Administration ("FDA") Special Protocol Assessment ("SPA") and Fast Track.   NOV-002 is also in Phase 2 development for treatment of early-stage breast cancer and chemotherapy-resistant ovarian cancer.

3. Before a new drug can be marketed in the United States, it must be approved by the Food and Drug Administration ("FDA"), and only after a lengthy period of clinical trials which are divided into several phases:

> Done at hospitals and research centers around the country, clinical trials are conducted in phases.  Phase 1 trials try to determine dosing, document how a drug is metabolized and excreted, and identify acute side effects. Usually, a small number of healthy volunteers (between 20 and 80) are used in Phase 1 trials.
>
> Phase 2 trials include more participants (about 100-300) who have the disease or condition that the product potentially could treat. In Phase 2 trials, researchers seek to gather further safety data and preliminary evidence of the drug's beneficial effects (efficacy), and they develop and refine research methods for future trials with this drug.  If the Phase 2 trials indicate that the drug may be effective -- and the risks are considered acceptable, given the observed efficacy and the severity of the disease -- the drug moves to Phase 3.
>
> In Phase 3 trials, the drug is studied in a larger number of people with the disease (approximately 1,000-3,000).   This phase further tests the product's effectiveness, monitors side effects, and, in some cases, compares the product's effects to a standard treatment, if one is already available.  [*See* http://www.fda.gov/fdac/features/2003/503_trial.html].

4. According to Novelos, three separate Phase 2 trials demonstrated clinical activity and safety of NOV-002 in combination with first-line chemotherapy in non-small cell lung cancer ("NSCLC).

5.      Novelos finalized an SPA for NOV-002 with the FDA in May 2006 for a single pivotal Phase 3 trial in advanced non-small cell lung cancer in combination with first-line chemotherapy, and obtained Fast Track designation in August 2006.  The primary endpoint of the trial is improvement in median overall survival to be measured following the occurrence of 725 events (deaths).  The Company commenced enrollment in Phase 3 in November 2006, and reached its enrollment target of 840 patients in March 2008.

6.      The NOV-002 Phase 3 trial was a randomized, controlled, open-label trial conducted across approximately 100 clinical sites in 12 countries.  NOV-002 was evaluated in combination with first-line paclitaxel and carboplatin chemotherapy versus paclitaxel and carboplatin alone.  According to the trial's Statistical Analysis Plan (SAP), a total of 725 events (deaths) were required to detect a 25% improvement (12.5 months versus 10 months) in overall median survival.  No interim analysis was performed.  In its annual report for the year ending December 31, 2007, filed with the SEC on Form 10-KSB on March 24, 2008 ("2007 Form 10-KSB"), Novelos reported that it expected to reach the Pivotal Phase in the trial (725 deaths) in mid-2009.

7.      At the start of the Class Period, Defendant Harry S. Palmin ("Palmin"), the President, Chief Executive Officer ("CEO") and director of the Company, stated that the Phase 3 trial had gone on longer than they thought it would because patients were living longer than had been expected, indicating that the NOV-002 Phase 3 trial was more successful than the Company had believed it would be.  Shortly thereafter, Palmin was quoted as stating that "[i]f this Phase III trial is positive, this will be revolutionary for the cancer field."

8.      Palmin's highly positive statements about the NOV-002 Phase 3 trials caused the price of the Company's stock to increase from $0.78 per share on December 10, 2009 to as high as $2.94 per share on January 4, 2010.

9.      Unbeknownst to the investing public, however, Palmin had no reasonable basis for his highly positive statements.  As was subsequently disclosed on February 24, 2010, NOV-002 did not meet its primary endpoint of improvement in overall survival in the Phase 3 trial.  Indeed, it was disclosed that the trial's duration was longer than originally anticipated not because of NOV-002's efficacy, but because the patients in the control arm of the trial – *__who did not__ receive NOV-002* – lived longer than anticipated.

10.     On this news, shares of the Company's stock declined more than 80%, from a close of $1.65 per share on February 23, 2010, prior to announcement of the results of the NOV-002 Phase 3 trial, to a close of $0.32 per share on February 24, 2010, after announcement of the Phase 3 trial results, on unusually heavy trading volume.  Plaintiff and the other members of the Class who purchased shares of Novelos common stock at prices artificially inflated by Defendant Palmin's Class Period statements about NOV-002, and in ignorance of the falsity of those statements, were damaged thereby.

## JURISDICTION AND VENUE

11.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, (15 U.S.C. §§ 78j(b) and 78t(a)), and Rule 10b-5 promulgated under Section 10(b) of the Exchange Act (17 C.F.R. § 240.10b-5).

12.     This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa), and 28 U.S.C. § 1331.

13.     Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b).  Many of the acts and transactions alleged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this Judicial District.

14.     In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

15.     Plaintiff Drew Weaver purchased Novelos common stock at artificially inflated prices during the Class Period and has been damaged thereby.

16.     Defendant Novelos is a Delaware corporation with its principal executive office located at One Gateway Center, Suite 504, Newton, Massachusetts 02458.

17.     Defendant Harry S. Palmin was, at all relevant times, a director, President, and CEO of Novelos.

18.     Defendant Palmin, because of his position with the Company, had access to material, non-public information and, therefore, knew that the positive representations which were being made were then materially false and misleading.

## BACKGROUND

19.     Novelos describes itself as a "biopharmaceutical company commercializing oxidized glutathione-based compounds for the treatment of cancer and hepatitis" and states that its "primary objective is to fully exploit [its] proprietary scientific and intellectual property portfolio in oxidized glutathione-based therapeutics."  Novelos' lead product candidate is NOV-

002, which the Company states "acts together with chemotherapy as a chemoprotectant and a chemopotentiator." The Company reported that three separate Phase 2 trials demonstrated clinical activity and safety of NOV-002 in combination with chemotherapy in NSCLC.

20. Specifically, the Company reported that in a controlled, randomized U.S. Phase 1/2 clinical trial, advanced NSCLC patients treated with NOV-002 in combination with first-line paclitaxel and carboplatin demonstrated improved objective tumor response ($p<0.05$) and higher tolerance of chemotherapy ($p<0.01$) compared to the active control group. In a controlled, randomized Russian Phase 2 trial, when used in combination with cisplatin-based first-line chemotherapy, NOV-002 increased the one-year survival of advanced NSCLC patients from 17% to 63% ($p<0.01$); median survival (i.e. 50% of patients dead) was not reached in the NOV-002 arm at 14 months compared to a median survival of 7 months in the active control. In a single arm Russian Phase 2 trial, advanced NSCLC patients treated with NOV-002 in combination with first-line cisplatin-based chemotherapy exhibited greater than 50% one-year survival. NOV-002 has an extensive safety database, and has also demonstrated improved recovery from chemotherapy toxicity in cancer patients. Importantly, Novelos reported that NOV-002 did not appear to be chemotherapy specific or tumor specific.

21. The NOV-002 Phase 3 trial was a randomized, controlled, open-label trial that had enrolled 903 patients with Stage IIIb/IV NSCLC, including all histological subtypes. The trial, conducted across approximately 100 clinical sites in 12 countries, evaluated NOV-002 in combination with first-line paclitaxel and carboplatin chemotherapy versus paclitaxel and carboplatin alone. According to the trial's SAP, a total of 725 events (deaths) were required to detect a 25% improvement (12.5 months versus 10 months) in overall median survival (hazard ratio of 0.8) with 85% power and a two-sided significance level of 0.05. No interim analysis was

performed.  In its annual report for the year ending December 31, 2007, filed with the SEC on

Form 10-KSB on March 24, 2008, Novelos reported that it expected to reach the Pivotal Phase in

the trial (725 deaths) in mid-2009.

22.    Under governing regulations promulgated by the FDA, companies sponsoring

clinical trials, such as Novelos, are required to monitor clinical drug trials, review and evaluate

evidence relating to the safety and effectiveness of the new drug candidate, and submit annual

reports to the FDA regarding the progress of the investigation.  In pertinent part, 21 CFR

§ 312.56, "Review of On-Going Investigations," provides:

> The sponsor shall monitor the progress of all clinical investigations being
> conducted under its IND [investigational new drug application].
>
> \*                \*                \*
>
> The sponsor shall review and evaluate the evidence relating to the safety
> and effectiveness of the drug as it is obtained from the investigator.  The
> sponsors shall make such reports to [the] FDA regarding information
> relevant to the safety of the drug as are required under 312.32.  The
> sponsor shall make annual reports on the progress of the investigation in
> accordance with 312.33.

*Id*.

23.    21 CFR § 312.33, "Annual reports," describes the information that sponsor

companies are required to submit to the FDA on an annual basis:

> A sponsor shall within 60 days of the anniversary date that the IND went
> into effect, submit a brief report of the progress of the investigation that
> includes:
>
> (a)    Individual study information. A brief summary of the status of
> each study in progress and each study completed during the
> previous year. The summary is required to include the following
> information for each study:
>
> (1)    The title of the study (with any appropriate study identifiers
> such as protocol number), its purpose, a brief statement
> identifying the patient population, and a statement as to
> whether the study is completed.

(2)     The total number of subjects initially planned for inclusion in the study; the number entered into the study to date, tabulated by age group, gender, and race; the number whose participation in the study was completed as planned; and the number who dropped out of the study for any reason.

(3)     If the study has been completed, or if interim results are known, a brief description of any available study results.

(b)     Summary information.  Information obtained during the previous year's clinical and nonclinical investigations, including:

(1)     A narrative or tabular summary showing the most frequent and most serious adverse experiences by body system.

(2)     A summary of all IND safety reports submitted during the past year.

(3)     A list of subjects who died during participation in the investigation, with the cause of death for each subject.

(4)     A list of subjects who dropped out during the course of the investigation in association with any adverse experience, whether or not thought to be drug related.

(5)     A brief description of what, if anything, was obtained that is pertinent to an understanding of the drug's actions, including, for example, information about dose response, information from controlled trials, and information about bioavailability.

(6)     A list of the preclinical studies (including animal studies) completed or in progress during the past year and a summary of the major preclinical findings.

(7)     A summary of any significant manufacturing or microbiological changes made during the past year.

(c)     A description of the general investigational plan for the coming year to replace that submitted 1 year earlier.  The general investigational plan shall contain the information required under 312.23(a)(3)(iv).

(d)     If the investigator brochure has been revised, a description of the revision and a copy of the new brochure.

(e)    A description of any significant Phase 1 protocol modifications made during the previous year and not previously reported to the IND in a protocol amendment.

(f)    A brief summary of significant foreign marketing developments with the drug during the past year, such as approval of marketing in any country or withdrawal or suspension from marketing in any country.

(g)    If desired by the sponsor, a log of any outstanding business with respect to the IND for which the sponsor requests or expects a reply, comment, or meeting.

*Id.*

24.    In compliance with FDA regulations, Novelos received, analyzed, and reported basic interim data, such as number of deaths, from the NOV-002 clinical trials to the FDA prior to, and throughout, the Class Period.  As noted above, the NOV-002 Phase trial was designed so that it reached its Pivotal Phase, the point at which it was statistically possible to determine whether NOV-002 met its primary endpoint of a 25% improvement in median survival, at 725 deaths.

25.    In its 2007 Form 10-KSB, the Company indicated that it expected to reach the Pivotal Phase of the NOV-002 Phase 3 trial in mid-2009.

26.    On November 15, 2009, the Company issued a press release announcing that Novelos and its academic collaborators had presented scientific findings at an international Cancer Conference.  Describing the abstracts of two poster presentations at the conference that release, in pertinent part, stated:

> NOV-002, a Cellular Redox Modulator, Enhances the Anti-Tumor Effect of Adoptively Transferred T cells in a Murine Melanoma Model. Drs. Alberto Montero and C. Marcela Diaz-Montero are presenting data showing that NOV-002 added to immunotherapy (adoptively transferred, tumor-specific T cells) ***increased survival and slowed tumor growth in this in vivo tumor model.*** Together with earlier work by these investigators showing that NOV-002 administered to mice suppressed the function of T cell-inhibiting myeloid-derived suppressor cells, these

findings provide further evidence of the ability of NOV-002 to increase anti-tumor cellular immune responses in vivo.

NOV-002 Suppresses Tumor Cell Growth by Modulating Redox-Sensitive Cell Signaling. Drs. Tew and Townsend's presentation of results in human tumor cell lines describes *the ability of NOV-002 to inhibit tumor cell proliferation* in vitro consequent to generation of oxidative signals and activation of cell signaling pathways that control cell survival. Their earlier published work showed that, in contrast to these findings, redox modulation by NOV-002 in myeloid lineage cells resulted in increased proliferation.

"The data being presented at the EORTC International Conference *reinforce the hypothesis that NOV-002 may provide in vivo anti-cancer efficacy via a combination of direct inhibition of tumor growth and enhancement of anti-tumor cellular immune responsivene*ss," said Christopher Pazoles, Ph.D., Vice President of Research & Development of Novelos. "The reported findings also support the concept that the dual actions of NOV-002 in cancer patients as both a chemopotentiator and a chemoprotectant may reflect similar redox modulation in tumor and myeloid cells that results in opposite proliferative responses."

*Id.* (Emphasis added).

27.     The foregoing statements concerning the success of the NOV-002 Phase1/2 clinical trials, as well as the study findings presented at the International Cancer Conference, conditioned the market to anticipate favorable results from the NOV-002 Phase 3 trial.

## THE MATERIALLY FALSE AND MISLEADING STATEMENTS

28.     On December 14, 2009, *BioMedReports*, which describes itself as a news portal "which covers Wall Street's biomedical sector and delivers financial and investment intelligence to a community of highly informed investors," issued a "Trade Alert" for Novelos. That Trade Alert stated "Trade Alert Issued for Novelos Therapeutics, Inc. (NVLT.OB) as Pivotal Phase III Drug Trial Patients Are Living Longer Than Expected."

29.     On December 15, 2009, *Marketwire* reported that the Trade Alert was issued following an interview with Defendant Palmin.  The article stated:

In an interview with Novelos Therapeutics, Chief Executive Officer Harry S. Palmin shared that investigations involving the company's lead compound, NOV-002, currently in a Pivotal Phase III trial for lung cancer under SPA and Fast Track, have gone on longer than expected.

"It's a 900 patient trial that was expected to read out some time during the middle of this year, *but the patients are living longer than expected*," explains Palmin. "In fact, we are now expecting conclusion of the trial early in 2010."

The company's drug technology is revolutionary because on the one hand, it potentiates chemotherapy, which provides better survival and better anti-tumor effects, but on the other hand together with chemotherapy, it also appears to help patients recover from the toxicity of chemotherapy.

*Id.* (Emphasis added).

30.    Defendant Palmin's statement that "patients are living longer than expected" was materially false and misleading because it indicates that the patients who received NOV-002 were surviving longer than the Company had initially anticipated. Defendant Palmin, however, knew, or recklessly disregarded, that the length of the unanticipated survival times could relate to the patients in the control arm of the study who did not receive NOV-002. Moreover, Defendant Palmin knew, or recklessly disregarded, that his statement had been interpreted to mean that the patients receiving NOV-002 were surviving longer than expected based on the issuance of the December 14, 2009 *BioMedReports* Trade Alert regarding Novelos.

31.    On December 15, 2009, *BioMedReports* issued a "Trade Alert Follow Up" for Novelos based on the Company's SEC filing in which it agreed to pay cash bonuses in three equal installments in aggregate amounts ranging from 80% to 150% of annual 2009 salaries for each employee so long as there are favorable results for the Phase 3 clinical trial of NOV-002. The article stated "[o]fficials for the company we issued the trade alert for yesterday have upped the ante and it could be a big sign that good things are coming. After our subscriber trade alert yesterday, shares rose nearly 13% and closed the day very strong at $1.18 with an [*sic*] record 3+

million shares traded.  Today we notice that others have begun to put out trade alerts on the same stock, so it appears this positive action may just be getting started."

32.    On December 31, 2009, *BioMedReports* published an article comparing the purported success of Novelos NOV-002 Phase 3 trial with Pfizer's decision to discontinue the trial of one of its cancer drugs.  That article stated, "[i]n case those of you following the *incredible developing story at Novelos Therapeutics* (OTC: NVLT) missed it, Pfizer Inc. (NYSE: PFE) has announced that it has decided to discontinue the late-stage study of its lung cancer candidate figitumumab (CP-751,871)." (Emphasis added).

33.    On that same date, *Marketwatch* published an article concerning Pfizer and Novelos that again quoted Defendant Palmin from the interview he conducted with *BioMedReports*:

> "We actually potentiate the chemotherapy," said Palmin in a recent interview with BioMedReports. ***We make the cancer cells more sensitive to chemotherapy and we also inhibit the cancer's ability to metastasize (spread), so there are all sorts of interesting effects that happen at the tumor level***.  However, on the normal cells -- for example bone marrow cells and blood cells -- which of course get damaged by chemotherapy -- we don't stop the damage but we do help the recovery from that damage***. In the words of big pharma, 'if this Phase III trial is positive, this will be revolutionary for the cancer field.***'"

*Id*. (Emphasis added).

34.    Defendant Palmin's statements concerning the effects of NOV-002 in inhibiting the cancer's ability to metastasize was materially false and misleading because Defendant Palmin knew, or recklessly disregarded, that the Phase 3 trial of NOV-002, in which the efficacy of the drug to inhibit the metastasizes of the cancer and improve median survival to a statistically significant degree, had not yet been completed.  Moreover, he knew, or recklessly disregarded, that his statement that the success of the Phase 3 trial would be "revolutionary," when taken in

conjunction with his statement that patients in the trial were living longer than anticipated, suggested not only success of the trial, but financial success for Novelos.

## **THE TRUTH IS REVEALED**

35.     On February 24, 2005, the Company issued a press release that reported that the primary endpoint of improvement in overall survival was not met in the NOV-002 Phase 3 trial. The Company further announced that detailed trial results were expected to be presented via appropriate scientific venue later this year.  The release further stated:

> "We are very disappointed that our pivotal Phase 3 lung cancer trial did not meet the primary survival endpoint," said Harry Palmin, President and CEO of Novelos. "We were hopeful of a positive outcome based on our statistical model simulations and stated assumptions. In retrospect, it appears our simulations were inaccurate due to trial data deviating from our statistical model, the impact of censoring patterns, and ***control arm survival exceeding our expectations based on historical precedents***. We will conduct a thorough analysis of all the data, and expect to present detailed Phase 3 lung cancer trial results later this year.

*Id*. (Emphasis added).

36.     Thus, as indicated by Defendant Palmin, the unanticipated survival times in the Phase 3 trial did not relate to the patients treated with NOV-002, but instead were experienced by patients in the control arm who did not receive that drug.

37.     An article published by *TheStreet* on that same day observed that Defendant Palmin's statement in the February 24, 2010 press release announcing the results of the Phase 3 trial was:

> an interesting concession for Palmin to make now because last December, he was claiming that the NOV-002 study took longer to complete than expected.  ***This suggested to him that patients treated with NOV-002 were living longer and that the study would be a success***.

*Id*. (Emphasis added).

38.     Following the announcement of the results of the NOV-002 Phase 3 trial, shares of the Company's stock declined more than 80%, from a close of $1.65 per share on February 23, 2010, prior to announcement of the results of the NOV-002 Phase 3 trial, to a close of $0.32 per share on February 24, 2010, after announcement of the Phase 3 trial results, on unusually heavy trading volume.

39.     A chart summarizing the price history and trading volume for Novelos stock over the past year is reproduced below:



### PLAINTIFF'S CLASS ACTION ALLEGATIONS

40.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Novelos' securities between December 14, 2009 and February 24, 2010, inclusive, seeking to pursue remedies under the Exchange Act.

41.     The members of the Class are so numerous that joinder of all members is impracticable.  As of March 20, 2009 there were 43,975,656 shares of Novelos' common stock outstanding.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Novelos or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

42.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

43.     Plaintiff will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

44.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Novelos; and

(c)     to what extent the members of the Class have sustained damages and the proper measure of damages.

45.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## UNDISCLOSED ADVERSE FACTS

46.     The market for Novelos' common stock was open, well-developed and efficient at all relevant times.  As a result of these materially false and misleading statements and failures to disclose, Novelos' common stock traded at artificially inflated prices during the Class Period.  Plaintiff and other members of the Class purchased or otherwise acquired Novelos' common stock relying upon the integrity of the market price of Novelos' common stock and market information relating to Novelos, and have been damaged thereby.

47.     During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Novelos' common stock, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and misleading.  Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as alleged herein.

48.     At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false or misleading

statements about Novelos' principal product NOV-002 and the FDA clinical trials conducted in connection therewith. These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of Novelos and its financial well-being, business relationships, and prospects, thus causing the Company's common stock to be overvalued and artificially inflated at all relevant times. Defendants' materially false and misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's common stock at artificially inflated prices, thus causing the damages complained of herein.

## LOSS CAUSATION

49.     Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

50.     During the Class Period, Plaintiff and the Class purchased common stock of Novelos at artificially inflated prices and were damaged thereby. The price of Novelos' common stock significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

## SCIENTER ALLEGATIONS

51.     Defendants acted with scienter because they: (i) knew that the public statements issued or disseminated by Defendant Palmin in the name of the Company were materially false and misleading; (ii) knew that such statements would be issued or disseminated to the investing public; and (iii) knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of

information reflecting the true facts regarding the Phase 3 clinical trials of NOV-002, their control over, and/or receipt and/or modification of Novelos' allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Novelos, participated in the fraudulent scheme alleged herein.

52.     As alleged above, as sponsor of pharmaceutical clinical trials, Novelos was required to monitor the progress of the NOV-002 Phase 3 clinical trial.   21 CFR § 312.56.  In addition, Novelos was required to make periodic reports to the FDA concerning the status of those trials.   *Id.*; 21 CFR 312.33.   As a consequence of these regulatory requirements, Defendants were privy to information about the survival rates of patients in the NOV-002 clinical trials.

53.     Despite Defendants' receipt of data concerning survival rates in the NOV-002 Phase 3 trial, Defendants made materially false and misleading statements about NOV-002's purported favorable impact on the inhibition of metastasis on cancer, and the progress of the NOV-002 Phase 3 trial.

54.     Defendant Palmin knew, or recklessly disregarded, that the increased survival times might have been attributable to the survival rates of the patients in the control arm of the trail, who did not receive NOV-002, as opposed to patients receiving the drug.   Moreover, Defendant Palmin knew, or recklessly disregarded, that *BioMedReports* was issuing Trade Alerts that suggested that the longer survival times were attributable to the efficacy of NOV-002, when there was no data available to support that claim.

### Applicability of Presumption of Reliance:
### Fraud On The Market Doctrine

55.     At all relevant times, the market for Novelos' securities was an efficient market for the following reasons, among others:

(a)     Novelos' stock was traded on the OTC Bulletin Boards with trading volume of in the hundreds of thousands and millions of shares throughout the Class Period;

(b)     As a regulated issuer, Novelos filed periodic public reports with the SEC and the NASDAQ;

(c)     Novelos regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services, including *BioMedReports*; and

(d)     Novelos was followed by several securities analysts during the Class Period which were publicly available and entered the public marketplace.

56.     As a result of the foregoing, the market for Novelos' common stock promptly digested current information regarding Novelos from all publicly-available sources and reflected such information in Novelos' stock price.  Under these circumstances, all purchasers of Novelos' common stock during the Class Period suffered similar injury through their purchase of Novelos' common stock at artificially inflated prices and a presumption of reliance applies.

### NO SAFE HARBOR

57.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint.

Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Novelos who knew that those statements were false when made.

## FIRST CLAIM

### Violation of Section 10(b) Of The Exchange Act And Rule 10b-5
### Promulgated Thereunder Against All Defendants

58.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

59.     During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase Novelos' common stock at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

60.     Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which

operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for Novelos' common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

61.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Novelos' financial well-being, business relationships, and prospects, as specified herein.

62.     Defendants employed devices, schemes and artifices to defraud, while in possession of material, adverse, non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Novelos' value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Novelos and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of Novelos' common stock during the Class Period.

63.     Defendant Palmin's primary liability, and controlling person liability, arises from the following facts: (i) Defendant Palmin was a high-level executive and director at the Company during the Class Period, and a member of the Company's management team or had control thereof; (ii) Defendant Palmin, by virtue of his responsibilities and activities as a senior officer

and/or director of the Company was privy to data about the Company's NOV-002 Phase 3 clinical trial; and (iii) Defendant Palmin was aware of the dissemination of information to the investing public which he knew or recklessly disregarded was materially false and misleading.

64.     Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of supporting the artificially inflated price of its common stock. As demonstrated by Defendant Palmin's material misstatements about NOV-002 throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

65.     As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Novelos' common stock was artificially inflated during the Class Period.  In ignorance of the fact that market prices of Novelos' common stock were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the common stock trades, and/or in the absence of material, adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired Novelos' common stock during the Class Period at artificially high prices and were damaged thereby.

66.     At the time of said misrepresentations and omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the truth about NOV-002 and Novelos, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Novelos common stock, or, if they had acquired such common stock during the Class Period, they would not have done so at the artificially inflated prices which they paid.

67.     By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

68.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's common stock during the Class Period.

## SECOND CLAIM

### Violation Of Section 20(a) Of The Exchange Act Against Defendant Palmin

69.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

70.     Defendant Palmin acted as a controlling person of Novelos within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of his high-level position, and awareness of the Company's operations and/or intimate knowledge of the false statements in connection with the NOV-002 Phase 3 trial that was disseminated to the investing public, Defendant Palmin had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.  Defendant Palmin was

provided with or had unlimited access to data about the NOV-002 Phase 3 trial, issued the statements that Plaintiff alleges are materially false and misleading, and/or shortly after these statements were issued and had the ability to cause the statements to be corrected.

71.     In particular, Defendant Palmin had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

72.     As set forth above, Defendant Palmin violated Section 10(b) and Rule 10b-5 by his acts and omissions as alleged in this Complaint.  By virtue of his position as controlling person, Defendant Palmin is liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Defendant Palmin's wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

(a)     Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)     Awarding damages in favor of Plaintiff and the other Class members against all Defendants for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)     Such other and further relief as the Court may deem just and proper.

**JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

Dated: March 5, 2010

**GILMAN AND PASTOR, LLP**

By: /s/ David Pastor_____
    David Pastor (BBO # 391000)
63 Atlantic Avenue, 3rd Floor
Boston, MA 02110
Telephone: (617) 742-9700
Facsimile: (617) 742-9701
Email: dpastor@gilmanpastor.com

*EGLESTON LAW FIRM*
Gregory M. Egleston
360 Furman Street, Suite 443
Brooklyn, NY 11201
Telephone: (646) 227-1700
Facsimile: (646) 227-1701
Email: egleston@gme-law.com
       greg.egleston@gmail.com

**RIGRODSKY & LONG, P.A.**
Seth D. Rigrodsky
Brian D. Long
919 North Market Street, Suite 980
Wilmington, DE 19801
Telephone: (302) 295-5310
Facsimile: (302) 654-7530
Email: sdr@rigrodskylong.com
Email: bdl@rigrodskylong.com

-and-

Timothy J. MacFall
585 Stewart Avenue, Suite 304
Garden City, NY 11530
Telephone: (516) 683-3516
Email: tjm@rigrodskylong.com

*Attorneys for Plaintiff*

## CERTIFICATION OF NAMED PLAINTIFF
### PURSUANT TO THE FEDERAL SECURITIES LAWS

I, Drew Weaver ("Plaintiff") declare the following as to the claims asserted under the federal securities laws that:

Plaintiff reviewed the complaint to be filed in this matter and authorized the filing.

Plaintiff did not purchase the security that is the subject of this action at the direction of Plaintiff's counsel or in order to participate in this private action.

Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

Plaintiff's transactions in *Novelos Therapeutics, Inc.* security that is subject of this action during the Class Period are as follows:

| No. of Shares | Stock Symbol | Buy/Sell | Date | Price Per Share |
|---|---|---|---|---|
| 100 | NVLT | Buy | 2-1-10 | 1.99 |
| 4895 | NVLT | Buy | 2-1-10 | 2.00 |
| (Same Trade) partial fills | | | | |
| | | | | |

Please list other transactions on a separate sheet of paper, if necessary.

Plaintiff has sought to serve as a class representative in the following cases within the last three years:

*None*

Plaintiff will not accept any payment serving as a representative party on behalf of the class beyond Plaintiff's *pro rata* share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 3 day of MARCH, 2010

Drew Wea

Signature

Drew Weaver

Print Name (& Title if applicable)