United States District Court
District of Massachusetts

```
_____
                            )
BORIS URMAN and RAMONA MCDONALD, )
individually and on behalf of   )
all others similarly situated,  )
        Plaintiffs,         )   Civil Action No.
                            )   10-10394-NMG
        v.                  )
                            )
NOVELOS THERAPEUTICS, INC. and  )
HARRY S. PALMIN,            )
        Defendants.         )
_____ )
```

**MEMORANDUM & ORDER**

**GORTON, J.**

This is a putative federal securities class action brought pursuant to the Securities Exchange Act of 1934 ("Exchange Act") on behalf of individuals who purchased or otherwise acquired the common stock of Novelos Therapeutics, Inc. ("Novelos") between December 14, 2009, and February 24, 2010 ("the Class Period"). This Court dismissed the Amended Complaint without prejudice on June 23, 2011. Before the Court is defendants' motion to dismiss the Second Amended Complaint.

**I.  Background**

**A.  The Defendants**

Novelos is a biopharmaceutical company specializing in the commercialization of oxidized glutathione-based compounds for the treatment of cancer and hepatitis. Harry S. Palmin ("Palmin") is

-1-

its Chief Executive Officer, President and Director.

## B. The Drug and the Clinical Trials

The drug referred to in this case as "NOV-002" is a small molecule compound designed to enhance the effectiveness of chemotherapy drugs and to shield against their toxic side effects. The proprietary formulation of oxidized glutathione used in NOV-002 was first developed in Russia by Valere in Aliquo Malum ("VAM"), a pharmaceutical company which marketed the product under the trade name "Glutoxim." In clinical trials conducted in Russia between 1996 and 1998 ("the Russian trials"), Glutoxim increased patients' one-year survival rate from 17% to 63% when used in combination with chemotherapy. On the strength of the Russian trials, Glutoxim was approved for use in the Russian Federation by the Russian Federation Ministry of Health.

Novelos subsequently obtained the rights to develop and market Glutoxim, which it re-designated as "NOV-002." In 1999, Novelos filed an Investigational New Drug ("IND") application with the Food and Drug Administration ("FDA") seeking approval of NOV-002 for use as a treatment for advanced non-small-cell lung cancer ("NSCLC"). Upon receiving FDA approval, Novelos sponsored a Phase 1/2 clinical trial which was completed with positive results in August 2005. Specifically, Novelos reported that advanced NSCLC patients treated with NOV-002 demonstrated improved objective tumor response and a higher chemotherapy

tolerance. Later that month, Novelos filed an IND Informational Amendment identifying a change in the color specification for NOV-002 ("the IND Amendment").

The FDA accepted the IND Amendment and approved NOV-002 for a Phase 3 trial, which began patient enrollment in November 2006 and reached its enrollment target of 840 patients in March 2008. By design, the Phase 3 trial was randomized, controlled and open-label. The trial employed two groups, or "arms," of patients: patients in the experimental arm received NOV-002 in addition to carboplatin-paclitaxel chemotherapy, while patients in the control arm received only the chemotherapy treatment. The primary efficacy endpoint, i.e., the requirement for success, of the Phase 3 trial was to demonstrate a 25% improvement in median overall survival time. The Phase 3 trial would conclude and become "unblinded" once 725 of the enrolled patients had died. In its 2007 SEC Form 10-KSB, Novelos reported that it expected the trial to reach the 725-death point in mid-2009. No interim analysis was to be (or was in fact) performed.

### C. The Alleged Misleading Statements

Two categories of statements made by Palmin were alleged to have been false and misleading. For ease of reference, this Court will refer to them as the "increased survival rate statement" and the "Phase 3 optimism statements."

### 1. The Increased Survival Rate Statement

On December 14, 2009, the beginning of the Class Period, the online publication BioMedReports issued a "Trade Alert" for Novelos declaring "Pivotal Phase III Drug Trial Patients Are Living Longer Than Expected." The following day, BioMedReports issued a press release which quoted from an interview conducted with Palmin:

> It's a 900 patient trial that was expected to read out some time during the middle of this year, but the patients are living longer than expected.

Plaintiffs alleged in the Amended Complaint that the foregoing statement was materially false and misleading because it insinuated that the patients who received NOV-002 (i.e., the experimental arm) were surviving longer than anticipated, suggesting that the Phase 3 trial was more successful than expected. It later became clear that, in fact, the unanticipated length of the trial related to the survival times for patients who did not receive NOV-002 (i.e., the control arm).

### 2. The Phase 3 Optimism Statements

On December 16, 2009, BioMedReports published an article entitled Novelos' CEO Eyeing "Revolutionary" Phase III Results. That article included portions of an interview with Palmin in which he stated:

> The point that I'm trying to make is that given our current statistical projections, because our trial is going late, if we assume that the control group does in fact what it's supposed to, around a ten month median

>   survival, and there's historical data on some four-
>   thousand patients with advanced stage lung cancer that
>   have taken our type of chemotherapy
>   (paclitaxel/carboplatin [standard of care in the U.S.]),
>   then we should be on track to achieve or possibly even
>   exceed our possible twelve and a half month median
>   survival target.

Palmin went on to tout the success of the Russian trials and the positive results of the Phase 1/2 trial in the United States. In another article, published by BioMedReports on December 31, 2009, Palmin announced the upcoming Phase 3 trial and remarked, "If this Phase III trial is positive, this will be revolutionary for the cancer field."

Plaintiffs alleged in the Amended Complaint (and continue to allege in the Second Amended Complaint) that the foregoing statements were materially false and misleading because Novelos substantially modified the manufacturing process and chemical composition of NOV-002 shortly before the Phase 3 trial. In light of those material changes, plaintiffs contend that Palmin was reckless to base his optimism for the Phase 3 trial on the success of earlier iterations of NOV-002.

### D. The Stock Price Decline

On February 24, 2010, the end of the Class Period, Novelos issued a press release in which Palmin reported that the primary endpoint of improvement in overall median survival had not been met in the NOV-002 Phase 3 trial:

>   We were hopeful of a positive outcome based on our
>   statistical model simulations and stated assumptions. In

> retrospect, it appears our simulations were inaccurate due to trial data deviating from our statistical model, the impact of censoring patterns, and control arm survival exceeding our expectations based on historical precedents.

Following the announcement of the disappointing Phase 3 results, the price of common stock of Novelos declined by over 80% from a close of $1.65 per share on February 23, 2010, to a close of $0.32 per share on February 24, 2010.

## II. Procedural History

On March 5, 2010, Drew Weaver ("Weaver"), individually and on behalf of all others similarly situated, filed the Complaint against Novelos and Palmin alleging 1) with respect to both defendants, a claim under Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Securities and Exchange Commission ("SEC") Rule 10b-5, 17 C.F.R. § 240.10b-5 and 2) with respect to defendant Palmin, a claim under Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

In October 2010, pursuant to the Securities Act of 1933, as amended by the Private Securities Litigation Reform Act of 1995 ("PSLRA"), the Court appointed Boris Urman ("Urman") and Ramona McDonald ("McDonald") as lead plaintiffs. Shortly thereafter, plaintiffs filed the Amended Complaint amplifying the factual pleadings in support of its securities fraud claims.

In June 2011, after full briefing, the Court allowed defendants' motion to dismiss the Amended Complaint on the grounds

that 1) plaintiffs failed to plead adequately two of the six elements of securities fraud (misrepresentation and scienter) and 2) having failed to state a claim for securities fraud, plaintiffs could not establish their derivative claim for control person liability.  Specifically, the Court found that Palmin's statement that "patients are living longer than expected" was not false and misleading and that allegations pled in support of plaintiff's claim that Novelos knowingly altered the drug did not give rise to a strong inference that defendants acted with the intent to deceive.  In an abundance of caution, the Court dismissed the Amended Complaint without prejudice and allowed plaintiffs leave to amend the Complaint a second time, with the caveat that the Court would dismiss the case with prejudice if the Second Amended Complaint failed to cure the identified deficiencies.

The Second Amended Complaint, filed in August 2011, contains three principal changes.  First and foremost, plaintiffs deleted reference to the increased survival rate statement, one of the principal allegations in the Amended Complaint.  Their claim now focuses almost entirely on Palmin's stated optimism about the potential Phase 3 success of NOV-002, which plaintiffs continue to allege was materially false and misleading because Novelos substantially modified the manufacturing process and chemical composition of NOV-002 shortly before the Phase 3 trial.  To bolster this claim, plaintiffs allege in the Second Amended

-7-

Complaint that 1) Novelos switched from a multiple-synthetic-step to a single-synthetic-step manufacturing process in August 2005 and 2) the chemical and manufacturing changes to the drug made in August 2005 were not subject to FDA approval.

In September 2011, defendants moved to dismiss the Second Amended Complaint on the grounds that 1) the supplemental allegations fail to cure the identified pleading deficiencies and 2) the deletion of Palmin's statement that "patients are living longer than expected" prevents the plaintiffs from establishing loss causation.

### III. Analysis

#### A. Substantive Law and Pleading Standards

Section 10(b) of the Exchange Act makes it unlawful "[t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative device or contrivance." 15 U.S.C. § 78j(b). SEC Rule 10b-5 similarly makes it unlawful:

> To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading . . .

17 C.F.R. § 240.10b-5(b).

To state a claim under Section 10(b) and Rule 10b-5, a plaintiff must adequately plead six elements:

> 1) a material misrepresentation or omission; 2) scienter, or a wrongful state of mind; 3) a connection with the purchase or sale of a security; 4) reliance; 5) economic loss; and 6) loss causation.

Matrixx Initiatives, Inc. v. Siracusano, 131 S. Ct. 1309, 1317-18 (2011); see also ACA Fin. Guar. Corp. v. Advest, Inc., 512 F.3d 46, 58 (1st Cir. 2008) (citing Dura Pharm., Inc. v. Broudo, 544 U.S. 336, 341-42 (2005)).

To survive a motion to dismiss for failure to state a claim under Fed. R. Civ. P. 12(b)(6), a complaint must contain "sufficient factual matter" to state a claim for relief that is actionable as a matter of law and "plausible on its face." Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). Assessing plausibility is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense" to determine whether the well-pled facts alleged in the complaint are sufficient to "permit the court to infer more than the mere possibility of misconduct." Iqbal, 129 S. Ct. at 1950.

The PSLRA imposes two heightened pleading requirements on federal securities fraud claims beyond those enumerated in the Federal Rules of Civil Procedure. Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 313 (2007). First, to support allegations of misleading statements or omissions, plaintiffs must

> specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.

15 U.S.C. § 78u-4(b)(1). Second, to plead scienter adequately, plaintiffs must state "with particularity facts giving rise to a strong inference" that the defendant acted recklessly or with the intent to deceive, manipulate, or defraud. 15 U.S.C. § 78u-4(b)(2); Greebel v. FTP Software, Inc., 194 F.3d 185, 199 (1st Cir. 1999). Ruling on a motion to dismiss a securities fraud claim therefore requires a district court to assess the strength of competing inferences. An inference of scienter is not strong enough to survive a motion to dismiss "when, viewed in light of the complaint as a whole, there are legitimate explanations for the behavior that are equally convincing." In re Credit Suisse First Boston Corp., 431 F.3d 36, 49 (1st Cir. 2005).

**B. Application**

Plaintiffs' security fraud claim, as pled in the Second Amended Complaint, centers around Palmin's stated optimism about the potential commercial success of NOV-002. Plaintiffs claim that Palmin had no reasonable basis for his optimism because of the material differences in manufacturing process and chemical composition between NOV-002 and previous iterations of the drug used in earlier successful trials.

Before addressing whether plaintiffs' amended allegations, considered as a whole, satisfy the exacting pleading requirements imposed by the PSLRA, the Court will take up the issue of whether one of the amended allegations is, as the defendants claim,

"demonstrably false." The Second Amended Complaint alleges that Novelos made a material change to the manufacture of NOV-002 in August 2005 when it switched from a multi-synthetic-step to a single-synthetic-step manufacturing process. Defendants maintain that the drug had always been manufactured using a single-step process. They cite as evidence the IND application filed with the FDA in August 1999, which stated that the drug was "manufactured in a single synthetic step." In response, plaintiffs appear to acknowledge their error but counter that even if a single-step process were used all along, it does not change the fact that material alterations to the drug's chemical composition were made in August 2005 which Palmin failed to reference when calling attention to the positive results of the trials.

The insurmountable problem for plaintiffs is that this Court has already found that very allegation lacking in scienter. In dismissing the Amended Complaint, this Court ruled that the inference of scienter arising from the non-disclosure of changes made to the drug's chemical composition was weaker than the competing, non-fraudulent inference that Palmin "understood the change to affect only the color specification, rather than the effectiveness or fundamental composition of the drug." Among other evidence, the Court relied in part on the fact that the IND Amendment documenting the changes was filed with and accepted by

the FDA. Plaintiffs attempt to bolster their case by pointing out that Informational Amendments do not require approval or comment by the FDA, thereby suggesting that the FDA's acceptance of the IND Amendment does not prove or even imply that the FDA considered the changes to be minor and immaterial.

The regulations relied upon by the plaintiffs cannot bear the weight plaintiffs place on them. Not only does the FDA have the authority to review IND amendments substantively, the record indicates that the FDA did so here. The FDA convened a meeting to review the IND Amendment, asked follow-up questions about matters deemed to be material and ultimately allowed NOV-002 to proceed to Phase 3. It is reasonable to infer that the 12 FDA experts who reviewed the IND Amendment, 10 of whom had doctorates in relevant fields, were able to distinguish between minor and major changes to a drug's chemical composition. That the experts scrutinized the increased moisture content of NOV-002 at that meeting suggests that the amendment was not "rubber stamped," as plaintiffs suggest. It is also reasonable to infer from the circumstances that had those experts found the changes in chemical composition to be material, they would have done something other than accept the amendment and allow NOV-002 to proceed to Phase 3.

Further undercutting plaintiffs' contention that the changes were material is the fact that the version of the drug used in

the Phase 1/2 trial appeared at the time to be an unmitigated success and received the go-ahead for a Phase 3 trial. As defendants point out,

> [t]here is no reason to infer that Novelos and Palmin would knowingly and fundamentally alter a drug that was well along on the path to success. The only plausible inference is that they believed that the changes to NOV-002 were minor and nonmaterial and would not affect the continued success of the drug.

Thus not only is the inference of scienter which plaintiffs ask this Court to draw factually inaccurate and weaker than a competing, non-fraudulent inference, it also is implausible. Under the circumstances, "an inference of culpable recklessness is a bridge too far." In re Smith & Wesson Holding Corp. Sec. Litig., No. 11-1436, 2012 WL 516073, at *8 (1st Cir. 2011).

While plaintiffs' failure to plead adequately the element of scienter prevents them from stating a claim for securities fraud under Section 10(b), two additional matters are worth examining. Plaintiffs' initial theory was that Palmin's statement in December 2009 that patients in the Phase 3 trial were living longer than expected caused the market price of Novelos stock to become inflated until February 2010, when it was revealed that the overall survival rate had not improved and the stock price correspondingly declined. Presumably because this Court concluded that the foregoing statement did not constitute a material misrepresentation, plaintiffs' Second Amended Complaint proceeds under the alternate theory that the operative materially

-13-

false and misleading statements were Palmin's comments about the success of the Phase 1/2 clinical trial.

Although their theory of fraud changed, their theory of loss causation remains the same.  Plaintiffs continue to maintain that the allegedly misleading information was first revealed to the market in December 2009, the precise month in which the Novelos stock price enjoyed a precipitous increase.  The timing of the disclosure is no small matter.  If the market accounted for the optimism surrounding the Phase 1/2 trial months before or after the sudden increase, plaintiffs would likely be unable to establish loss causation.  See, e.g., In re Retek Inc. Sec. Litig., 621 F. Supp. 2d 690, 703-06 (D. Minn. 2009) (loss causation not established where alleged misrepresentation made public months before the change in stock price).

A potential flaw in plaintiffs' theory of stock inflation is revealed by Novelos's annual Form 10-KSB and quarterly Form 10-QSM filings with the SEC.  Each of those 16 filings, made between 2006 and 2009, publicly disclosed the success of the Phase 1/2 trial.  One representative filing read:

> NOV-002, currently in Phase 3 development in the U.S., has demonstrated an excellent safety and efficacy profile in Russia as an adjunctive treatment to chemotherapy for a number of different cancers. The Russian data is particularly compelling in non-small cell lung cancer. ... Positive results in a controlled U.S.-based Phase 1/2 lung cancer study suggest that the Russian experience can be replicated here.

Placed in this context, plaintiffs' theory that the 17th public

-14-

repetition of the same information in December 2009 caused Novelos stock to skyrocket is doubtful.

Plaintiffs respond that at this stage they need only provide defendants with some indication of the loss and some causal connection to the fraud, however attenuated.  Not so.  To carry their pleading burden, plaintiffs must allege

> something beyond the mere possibility of loss causation . . . lest a plaintiff with a largely groundless claim be allowed to take up the time of a number of other people.

Twombly, 550 U.S. at 557-58.  Post-Twombly, a plaintiff's loss causation theory must be plausible.  Lormand v. US Unwired, Inc., 565 F.3d 228, 258 (5th Cir. 2009).

In addition to pleading a plausible theory of stock price inflation, a plaintiff must also allege that the corresponding stock price deflation was caused by a "corrective disclosure," i.e., that the market reacted to the revelation of the alleged misrepresentation or the facts underlying it, not to other negative information about the company unrelated to the alleged fraud.  Bricklayers & Trowel Trades Int'l Pension Fund v. Credit Suisse First Boston, No. 02-12146-NMG, 2012 WL 118486, at *10 (D. Mass. Jan. 13, 2012).  The corrective disclosure alleged by plaintiffs is the announcement of the disappointing Phase 3 trial results.  In contrast to their theory of stock inflation, plaintiffs' explanation for the decline in stock price is not only plausible but compelling: when investors discovered that

NOV-002 did not improve patients' overall survival rate as hoped, they abandoned ship. The problem lies in the dissymmetry between the alleged fraud and the disclosure. By plaintiffs' own account, the market did not react to any disclosure that the NOV-002 used in the Phase 3 trial differed in chemical composition or manufacturing process from earlier iterations of the drug. It reacted to the disappointing Phase 3 results.

While a disclosure need not "precisely mirror the earlier misrepresentation" to qualify as corrective, it "must at least relate back to the misrepresentation and not to some other negative information about the company." In re Williams Sec. Litig., 558 F.3d 1130, 1140 (10th Cir. 2009). Here, the disclosure and the allegedly misleading statements are "related" in the colloquial sense, in that they both pertain to the Phase 3 trial. It is nevertheless unclear whether that nexus is strong enough to satisfy the PSLRA's exacting proximate causation standard. Because this Court has already found that plaintiffs have inadequately pled the element of scienter, the Court need not reach the issue and will not belabor it.

## C. Section 20(a) Liability

Plaintiffs assert a claim against Palmin for control person liability pursuant to Section 20(a) of the Exchange Act. Section 20(a) imposes joint and several liability on any person who "directly or indirectly controls any person liable" under Section

10(b) and Rule 10b-5. 15 U.S.C. § 78t(a). Because the Second Amended Complaint fails to allege an underlying violation of the federal securities laws, plaintiffs' Section 20(a) claim must also be dismissed. See Greebel, 194 F.3d at 207.

**D. Dismissal With Prejudice**

Having found that plaintiffs once again fail to state actionable claims for securities fraud and control person liability, the Court will dismiss the Second Amended Complaint with prejudice. See Urman v. Novelos Therapeutics, Inc., 796 F. Supp. 2d 277, 285-86 (D. Mass. 2011) (dismissing Amended Complaint without prejudice "with the caveat that if the second amended complaint is deficient, dismissal will then be with prejudice").

**ORDER**

In accordance with the foregoing, defendants' motion to dismiss the Second Amended Class Action Complaint (Docket No. 41) is **ALLOWED** and the case is **DISMISSED** with prejudice.

**So ordered.**

/s/ Nathaniel M. Gorton
Nathaniel M. Gorton
United States District Judge

Dated June 11, 2012